28 PROSPECT HILL ST., INC., et al.

v.

Paul GAINES, et al.

No. 82–533–M.P.

Supreme Court of Rhode Island.

June 21, 1983.

Joseph T. Houlihan, Jeffrey J. Teitz, Newport, for plaintiffs.

Thomas W. Kelly, City Sol. for City of Newport, for defendants.

OPINION

KELLEHER, Justice.

We have, at the request of twenty-nine Class B liquor licensees, issued a statutory writ of certiorari pursuant to Rhode Island's Administrative Procedures Act, G.L. 1956 (1977 Reenactment) § 42–35–16, to re-

view a Superior Court judgment affirming a decision of the State Liquor Control Administrator, 453 A.2d 1104. The administrator in turn has affirmed a November 25, 1981 decision of the city of Newport's Board of Licenses which would have required all Class B retail liquor establishments, beginning on December 1, 1981, to cease operations on Saturdays, Sundays, and the night before a legal holiday at 1 a.m. The 1 a.m. closing represented a change in the board's policy, for it formerly permitted such establishments to operate until 2 a.m. on those three previously enumerated occasions.

To place this dispute in better perspective, we would begin by detailing some of the legislative history of G.L. 1956 (1976 Reenactment) § 3–7–7, including reference to one of its statutory predecessors. A Class B retail license is issued to a bona fide tavern keeper or victualer who in turn sells alcoholic beverages for consumption on the premises at the bar or at tables where food is served. Beginning in May 1941, Class B establishments were required to be open from at least 9 a.m. to 7 p.m. and totally shut down from 1 a.m. to 6 a.m. The local licensing boards could, if they desired, establish in their respective municipalities a closing time earlier than the 1 a.m. deadline. Public Laws 1941, ch. 1037. With the enactment of the General Laws of Rhode Island revision of 1956 at the January 1957 session of the General Assembly, ch. 1037 became G.L. 1956, § 3–7–7. See P.L. 1957, ch. 34.

In 1971 the General Assembly, with the passage of P.L. 1971, ch. 153, amended § 3–7–7 by giving the local licensing boards the discretionary authority to allow Class B licensees, upon payment of an additional $200 fee, (1) to remain open on Fridays, Saturdays, and the nights before legal Rhode Island holidays until 2 a.m. and (2) to charge the customer a cover, minimum, or door charge.[1] After the 1971 amendment became effective, Newport's licensing board opted to give the benefit of the 1971 amendment to its Class B licensees.

Time marched on, and four years later the General Assembly once again amended § 3–7–7 with the enactment of P.L. 1975, ch. 71, by inserting immediately after the authorization for the cover charge the following proviso:

"[A]ll requests for such a 2 a.m. license shall be advertised by said local licensing board in a newspaper having a circulation in the county where the establishment applying for the license is located."

The next year the Legislature, by its adoption of P.L. 1976, ch. 22, once again amended § 3–7–7 by deleting the cover-charge stipulation from the $200-fee portion of the statute and placing it in an earlier portion of the statute. The effect of the 1976 amendment was to afford to all Class B licensees the opportunity of imposing a cover or similar charge without having to pay the additional $200. With the 1976 transposition of the cover-charge stipulation, the 1975 advertising requirement ended up immediately following the language of the 1971 amendment so that today a person reading § 3–7–7 might consider the 1971 and 1975 amendments inextricably intertwined. At license-renewal times in Newport[2] those licensees who desired the

1. The authorizing of cover, minimum, or door charges was the legislative response to our holding in *Chernov Enterprises, Inc., v. Scuncio,* 107 R.I. 439, 268 A.2d 424 (1970), where we noted that a Class B licensee could not insist on a separate charge or fee for patrons who might wish to witness or participate in the entertainment being offered by a licensee.

2. Parenthetically, it should be pointed out that all Class B licenses expire on December 1 next after their issuance. See G.L. 1956 (1976 Reenactment) § 3–5–8. Consequently, hearings on the renewal of all liquor licenses, including Class B, are usually held in November because § 3–5–17 requires that any application for a liquor license be advertised once a week for at least two weeks in a newspaper published in the city or town where the applicant proposes to carry on business. The only exception to the advertising requirement is an application for a Class F license or a Class G license. The Class F license is issued for one day for a period of nineteen hours to social, religious, charitable, or political organizations and authorizes the sale of beer and wine or alcoholic beverages. The Class G license is issued to a common

extra hour's revenue would submit to the licensing board an application for renewal of their Class B license and a request form entitled "Application for 2 A.M. Closing for Friday nights, Saturday nights and nights before Rhode Island legal holidays."

In November 1981 the board held two public hearings on petitioners' respective applications for the issuance of their Class B licenses and so-called 2 a.m. closing. The board's records indicate that the real point of controversy at the board hearings was whether the board would continue to offer the licensees the opportunity to be open year-round until 2 a.m. on the days or nights enumerated in the statute. The board was presented with signed petitions, some of which favored the retention of the 2 a.m. closing whereas others sought a return to the 1 a.m. closing time. Arguments both pro and con were made, and one citizen observed that the board's decision on this issue "would be heard throughout the world." Another, who described himself as the owner of a family restaurant, told the board that he would be financially hurt by a 1 a.m. closing. However, another resident, whose neighborhood is apparently close to several bars, was all for the early closing because, in his words, he and his family would gain an extra hour's sleep.

On the evening of November 25, 1981, after the last of the pros and the cons had been heard, the board members expressed various points of view, engaged in a bit of parliamentary maneuvering, and finally approved a motion that "we not renew the 2 a.m. closing." The board's decision brought the twenty-nine petitioners before the State Liquor Control Administrator, a Superior Court justice, and this court on what is a simple question of law: Just what did the General Assembly intend when in 1975 it amended § 3–7–7 and referred to a "2 a.m. license"?

The petitioners first point to the pertinent language of the Class B license statute

as it presently appears in G.L. 1956 (1976 Reenactment) § 3–7–7 (1982 Cum.Supp.), which states:

" * * * provided further, however, that any holder of a class B license may upon the approval of the local licensing board and for additional payment of two hundred dollars ($200) open for business at twelve o'clock [12:00] p.m. and on Fridays and Saturdays and the night before legal Rhode Island holidays may close at two o'clock [2:00] a.m.; all requests for such a two o'clock [2:00] a.m. license shall be advertised by said local licensing board in a newspaper having a circulation in the county where the establishment applying for the license is located."

They then point to the Legislature's use of the term "2 a.m. license" and the requirement of an extra fee as clear and positive proof that the Legislature had created two separate licenses, each of which could be revoked only for cause after notice and a hearing.

■ The petitioners remind us of our recent holding in *Tillinghast v. Town of Glocester*, R.I., 456 A.2d 781 (1983), in which we rejected the municipality's contention that there was no necessity for notice and hearing before it could refuse to renew a campground license. A licensee, we said, has a property interest in its business and its continuation which entitles it to the benefits of due process, and a municipality should notify a licensee with reasonable particularity of the charges it will be called upon to meet at any hearing concerning its continued retention of a license. *Id.* 456 A.2d at 784–85.

■ We acknowledge and reiterate what was said in *Tillinghast*, but we must reject petitioners' argument that § 3–7–7 has conferred upon each of them a 2 a.m. license that falls within the ambit of the protection afforded by *Tillinghast*. As noted before, Class B licensees had the opportunity to

carrier such as a railroad company or a passenger vessel and authorizes the sale of alcoholic beverages to the passengers. The Class G

license is good for one year after the date of its issuance.

conduct business up until 2 a.m. on certain specified days during a four-year period from 1971 to 1975. The first mention of a "2 a.m. license" came with the passage of P.L. 1975, ch. 71, when the phrase "all requests for such a 2 a.m. license" first made its appearance on the statute books.

In seeking to establish the intent of the 1975 amendment, we have examined the legislative record for the General Assembly's 1975 session. On March 4, 1975, the late Senator Erich A. O'D. Taylor of Newport and his colleague from the neighboring town of Middletown, Senator Joseph J. Chaves, introduced Senate Bill No. 75–S 394. The title of the bill reads, "An Act Relating to the Sale of Alcoholic Beverages." [3] Upon its introduction, the bill was referred to the committee on special legislation and in due course made its way unchanged through the legislative channels and ultimately was given the designation P.L. 1975, ch. 71. The bill came attached with an explanation prepared by the Legislative Council which reads, "This act requires that an application of a Class B licensee to sell alcoholic beverages until 2 a.m. at certain times be advertised."

We read the bill as requiring any application by a holder of a Class B license to remain open until 2 a.m. on the days specified in the 1971 statute to be advertised by the local board in a newspaper having circulation in the county in which the tavern or restaurant is located. The intent of the sponsors in presenting the act and the General Assembly in adopting its provisions is quite clear. The statute was not enacted for the benefit of the licensee. Rather, its sole purpose was to alert the residents living near an applicant to give them the opportunity to appear at the hearing on the licensee's application, if they so desired, and express their approval or disapproval of the proposed extra-hours operation. The 1975 amendment's use of the word "license," in our opinion, did not create a new class of license that would come within the protection of the due-process clause.

Further proof of the Legislature's 1975 intent can be found by examining the provisions of G.L. 1956 (1976 Reenactment) § 3–7–6 (1982 Cum.Supp.), which provide that any holder of a license of Class A (retail liquor store) or Class B (tavern keeper or victualer) or Class C (saloon keeper) or Class D (club) "who applies before October 1 in any licensing period for a license of the same class for the next succeeding licensing period shall be prima facie entitled to renewal thereof * * *." Certainly, if the Legislature had intended that its permission for an extra-hours operation should have been considered in the same category as a Class B license, it would have taken steps to amend § 3–7–6 and have added the 2 a.m. license to the categories already spelled out in the statute.

Through the years since 1970 the General Assembly has afforded the licensing authorities in Newport, Middletown, and Portsmouth the opportunity, if they so desired, to extend the 1 a.m. closing time for Class B establishments. In 1970, 1977, and again in 1978, the Legislature authorized the respective licensing boards of the three municipalities in question, after the receipt of a $200 fee, to "permit" a Class B licensee to remain open until 2 a.m. during the period from May 1 to the following September 30. See P.L. 1970, ch. 197; P.L. 1977, ch. 225; and P.L. 1978, ch. 338. At no time did the Legislature, when enacting legislation giving the local licensing authorities the option of allowing the extra-hour sale of alcoholic beverages, ever use the term "license." The only occasion when the term "license" was employed with the 2 a.m. closing occurred in the 1975 legislation mandating that the pendency of an application for a 2 a.m. license be advertised.

It is obvious from an examination of the statutory development of § 3–7–7 since the 1970s that the use of the term "license" in 1975 by the Legislature was pure happenstance. In our opinion, the Legislature intended that the question of extending the

---

3. See Journal of the Senate, Vol. 89, No. 33, p.   S.J.–3.

closing hours of Class B licensees should be left to the discretion of the local municipal licensing boards and that thus the only license that is subject to the protection of the due-process guarantee is the license that authorizes an individual to sell alcoholic beverages.

 In acting pursuant to the delegated power to establish the hours during which alcoholic beverages could be sold within the city of Newport, the licensing board was acting in a legislative capacity, and since its decision was to apply equally to all Class B licensees, there is no necessity that each of the licensees be afforded a notice and hearing before the board could opt for the 1 a.m. closing time. *Walsh v. Dominy,* 53 A.D.2d 1063, 1064, 386 N.Y.S.2d 136, 138–39 (1976); *see also City of Pompano Beach v. Big Daddy's, Inc.,* 375 So.2d 281, 282 (Fla. 1979).

We would conclude with the sagacious comments expressed by the late Justice Antonio A. Capotosto in *Di Traglia v. Daneker,* 83 R.I. 227, 230, 115 A.2d 345, 347 (1955), that

> "[t]he public has a vital and continuing interest in the control and supervision of the liquor traffic. Therefore the business of selling beverages, if permitted at all, is clearly and completely subject to the police power of the state in order that the health, morals and safety of the people generally may be protected against the evils of intemperance. In the exercise of that power the state may impose restrictions and burdens, however great, which the legislature may deem advisable to prescribe, so long as such provisions are not discriminatory or inconsistent with federal or state constitutional requirements."

We cannot fault the conclusions reached by Newport's licensing board or the State Liquor Control Administrator or the Superior Court justice who approved the administrator's conclusion.

The licensees' petition for certiorari is hereby denied and dismissed, the writ previously issued in this dispute is quashed, and the records certified to us are hereby remanded to the Superior Court with our decision endorsed thereon.

MURRAY, J., did not participate.